IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LARRY RIDER,

      Petitioner,                      No. CIV S-07-0329 RRB GGH P

   vs.

R. SUBIA, et al.,

      Respondents.               FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1990 petitioner was convicted of second degree murder and sentenced to fifteen years to life. Answer, Exhibit A. In this action, petitioner challenges the March 23, 2006, decision by the California Board of Prison Hearings (BPH) finding him unsuitable for parole. This was petitioner's fourth subsequent suitability hearing. Answer, Exhibit B, p. 33. Petitioner alleges that there was insufficient evidence to support the BPH decision finding him unsuitable for parole. After carefully considering the record, the court recommends that the petition be denied.

/////

/////

II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. <u>Neelley v. Nagle</u>, 138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. <u>Moore v. Calderon</u>, 108 F.3d 261, 263 (9th Cir. 1997).

In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. <u>Id</u>. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. <u>Williams (Terry)</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Williams (Terry)</u>, 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

In the instant, the Riverside County Superior Court, California Court of Appeal and California Supreme Court summarily denied petitioner's state habeas petitions raising the claims raised in the instant petition. Answer, Exhibits D E, F. Accordingly, the court will independently review the record to determine whether the denial of petitioner's claims was an unreasonable application of clearly established Supreme Court authority.

III. Factual Background

A summary of petitioner's offense is contained in the probation officer's report attached to the answer as exhibit C:

|   |   |
|---|---|
| 1 | On August 22, 1989, at approximately 8:30 p.m., Hemet police officers were dispatched to a motel on San Jacinto Street to assist the Fire Department regarding a report of a fight. After the deputy arrived, the fire captain informed him that a six-month old female infant appeared to have been beaten. The infant, Korey Ferrier, had severe swelling to the head, visible bruising on the left side of her head, and she was barely breathing. The infant, accompanied by her mother, Tamera Ferrier, was transported to the Hemet Valley Medical Center via ambulance. The child was admitted at 8:47 p.m., with gross swelling of the entire head area, and upon admission, the child was not breathing. She was subsequently air-lifted to Loma Linda University Hospital, within several hours. She was admitted comatose, with multiple skull fractures. |

On August 22, 1989, at approximately 8:30 p.m., Hemet police officers were dispatched to a motel on San Jacinto Street to assist the Fire Department regarding a report of a fight. After the deputy arrived, the fire captain informed him that a six-month old female infant appeared to have been beaten. The infant, Korey Ferrier, had severe swelling to the head, visible bruising on the left side of her head, and she was barely breathing. The infant, accompanied by her mother, Tamera Ferrier, was transported to the Hemet Valley Medical Center via ambulance. The child was admitted at 8:47 p.m., with gross swelling of the entire head area, and upon admission, the child was not breathing. She was subsequently air-lifted to Loma Linda University Hospital, within several hours. She was admitted comatose, with multiple skull fractures.

On August 25, 1989, at approximately 4:25 a.m., Korey Ferrier had died in the intensive care unit at Loma Linda University Hospital, after not being able to be sustained on life-support systems.

The cause of death, as concluded by a pathologist, was due to blunt force trauma inflicted to the head/skull of the victim. In addition to bruising to the entire head area, the pathologist also observed several other bruise marks on the body. Noted were: bruises to the neck, bruises to the lower left side of the pelvic area, bruises to the left forearm, bruises to the lower back, bruises to buttocks and two bumps to the ribs on the back. The skull revealed numerous fractures throughout the entire skull. In the doctor's professional opinion, he reported that such traumatic injuries to the victim were caused by someone striking the victim's head with a blunt object, striking the head against a blunt surface such as the floor or wall, or by kicking or stomping on the victim's head with shoes.

The investigation of the child's death revealed that Tamera Ferrier and her daughter, Amanda, age two, and Korey (decedent) had been living in a motel for approximately two and a half weeks with Larry Dean Rider, the defendant. The defendant was the biological father only to the two year old child, Amanda. On the night in question, all parties were in the motel room. The defendant was watching television and drinking beer. Korey had been put to sleep on a bed, on the floor, near the bathroom. The infant was uncovered and lying on her stomach, asleep, when Tamera left the motel room with her daughter, Amanda, in order to go to the store for some groceries. She left Korey in the care of the defendant.

Tamera returned from the store, with her daughter, Amanda, approximately ten minutes later. She then went to check on the infant, who was now observed lying on her back, partially covered with a pillowcase. Tamera Ferrier told officers that the infant was, "...lying funny...she was on her back, but lying crooked. Her back was arched. She was breathing strange and her eyes were rolling around. I picked her up and her head was flopping from side-to-side. Her head fell to one side and I saw her ear." Blood was oozing out of the infant's ear. Tamera then asked the defendant what had happened. He replied, "I didn't touch her...she'll be fine...she's not hurt." Tamera then attempted to get outside to call emergency, however, the defendant prevented her from doing so while stating, "She's okay, she'll be fine." The defendant finally allowed her to call the ambulance, whereby stating, "you'd better not say anything" as he walked away.

Tamera Ferrier opined, "He beat her. I know he beat her. He doesn't like the

baby very much...the baby's teething and cries a lot and crying gets on his nerves."

Attempts to locate the defendant were unsuccessful for several days following the incident and the child's death. However, on August 29, 1989, a Riverside County Sheriff's deputy was contacted by David Studer, who advised that the defendant was with him at a fellowship church and wanted to surrender himself to the police. Arrangements for the defendant's surrender were then made. The defendant voluntarily accompanied the deputy into the Hemet Police Department in order to be interviewed by the detective investigating the matter. Mr. Studer was also interviewed in regards to whatever conversations may have taken place. Mr. Studer explained that the defendant was referred to him by his (the defendant's) sister, who had heard of Mr. Studer's reputation for publicly speaking about Christianity. As a result, the defendant participated at a men's prayer breakfast and subsequently made several statements to Mr. Studer. The defendant had told Mr. Studer that he had been drinking on the night of the incident and that he had "shook the baby" and the "baby cried a whole lot" and he, defendant, had "slapped the baby a little because it was crying." He also threw the baby down on a wooden pallet, which was in the motel room. However, the defendant never admitted to Mr. Studer that he had inflicted serious injury to the infant.

The defendant told the investigator, during questioning, that he did not touch the infant. He maintained that nothing happened. He said he had been watching television and had consumed quite a few beers, however, was not drunk. His theory of the baby's death was that she probably fell off the pallet she was sleeping on and hit her head on the floor. Upon inspection, the infant had a bruise and some swelling to the left side of the head, but was fine, in his opinion. The defendant also observed that the infant's head was swollen and deformed but, again, was fine in his opinion and was breathing fine and acting normal. The defendant also advised the investigator that he was not left alone in the room with the child and, if so, Tamera was only gone a very short while. After the defendant was advised that his statements conflicted with the facts and information gathered, he refused to make any further statements.

Answer, Exhibit C.

IV.  <u>Discussion</u>

Since the approximate five years since the issuance of <u>McQuillion v. Duncan</u>, 306 F.3d 895 (9th Cir. 2002), we know this about the liberty interest implicated by California's parole laws regarding indeterminate sentences, i.e., parole suitability hearings, which if successful for the petitioner, will result in the establishment of an actual parole date (but never less than the minimum term):

\\\\\

5

1. A liberty interest exists, <u>Irons v. Carey</u>, No. 05-15275, 2007 WL 2027359 (9th Cir. July 13, 2007) citing cases;

2. Reliance on unchanging factors in denying parole suitability *might* implicate a violation of that liberty interest.  <u>Biggs v. Terhune</u>, 334 F.3d 910, 916 (9th Cir. 2003);

3. A finding by the Board of Parole Hearings (BPH--formerly BPT) (or at a later time, by the Governor) concerning the circumstances or gravity of the crime in and of itself is sufficient to deny suitability; <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 682, 128 Cal. Rptr. 2d 104, 161; <u>Irons</u>, at * 5; but the nature of the offense must be "particularly egregious" to constitute a basis to deny parole suitability.  <u>Rosenkrantz</u>, 29 Cal. 4th at 683, 128 Cal. Rptr. 2d at 161.

4. However, "particularly egregious" means nothing more than finding elements in excess of those "minimally necessary to convict." <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1095, 23 Cal. Rptr. 3d 417, 440 (2005);

5. If the petitioner has served less than the minimum term of his indeterminate sentence, "all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." <u>Irons</u> at * 6, but see footnote 1 of <u>Irons</u> expressing no opinion if the prisoner has served more than his minimum term, i.e., *maybe* that is the time frame against which reliance on unchanging factors is truly suspect[1];

6. If the BPH determined that the crime was vicious, or performed in a callous manner, or the motive was trivial, and so forth – all factors relating to the circumstances of the crime – and such is adopted by the state courts on review, a federal court must find the state court

---

[1] Nothing in California statutes or regulations, <u>see</u> Cal. Penal Code 3041, 15 CCR § 2402, would expressly so limit the decision of the BPH and Governor, thus the potential limitation must be of federal origin.  However, as undue reliance on unchangeable factors has never been found thus far by the Ninth Circuit, the commencement point of the limitation, or the precise blend of crime circumstances and years since, has not been  defined.  We do know that in <u>Irons</u>, five times of application was insufficient.  <u>Irons</u> did not decide that reliance on unchanging factors after the minimum term had been served was unlawful.  We simply know that "maybe" that will be the case.

decision(s) AEDPA-unreasonable before a writ of habeas corpus may be granted.  Irons, supra.

With respect, after Irons, the undefined "mights" and "maybes" serve as an indecipherable present guide to knowing just when the liberty interest in parole may be violated by reliance on unchanging factors.  Moreover, one does not know whether such reliance, if it is ever held to be insufficient, is based on passage of time alone, or is an uncertain blend of crime circumstances and passage of time.  The state courts' adoption of the BPH or Governor's decision about the circumstances of the crime is now essentially unreviewable – at least prior to the expiration of the minimum term.  That is, the circumstances of the crime in terms of viciousness, callousness, triviality and the like, is essentially an unchanging value judgment whose correctness cannot often be disputed regardless of the time when such a judgment is made – right after the conviction, just prior to expiration of a minimum term, well after the expiration of a minimum term. [2]

Review of the federal appellate cases demonstrates that no guided finding of undue reliance on unchanging factors can be made in this case.  Biggs v. Terhune, supra, the case that commenced the discussion on unchanging factors, involved the first degree bludgeoning murder of a witness facilitated, but not committed, by Biggs.  He was denied parole eligibility at his initial hearing in 1999 in part because of the gravity of the crime.  All might agree that such a murder was grave, and it will never be properly classified as anything but such.  Nevertheless, the Ninth Circuit found that "continued reliance" on unchanging factors could violate due process.

---

[2] The undersigned has previously determined the arbitrary nature and lack of predictive value generally found in a circumstances of the crime parole suitability denial based on unchanging circumstances despite the passage of sixteen years and more from the date of the conviction coupled with an unblemished prison record.  See Irons v. Warden of California State Prison-Solano, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005).  That analysis, focusing on the predictive nature of the crime for future violence in combination with expert psychiatric reports or other forward looking evidence, has been cited with approval by the California Court of Appeal.  In re Elkins, 144 Cal. App. 4th 475, 50 Cal. Rptr. 3d 503, 522 (2006); In re Scott, 133 Cal. App. 4th 573, 34 Cal. Rptr. 3d 905 (2005).  However, since that analysis only received the comment that it was an "understandable [AEDPA] error" in the concurrence of Judge Reinhardt, that analysis concerning the trigger time of undue reliance will not be utilized herein.

Although not stating such, the intimation of <u>Biggs</u> was that the third or fourth time of reliance on the circumstances of the crime would be too much. Certainly, it was not understood by the undersigned from reading <u>Biggs</u> that the time at which continued reliance would be too much would occur in 2010 – the time at which <u>Biggs</u> will have served his minimum term. Biggs' minimum term is served in 2010, and Biggs will have had approximately 5 or 6 more hearings by that time. However, subsequent Ninth Circuit cases have not upheld the undersigned's reading of <u>Biggs</u>.

In <u>Sass</u>, no comparison review of other cases was undertaken, there was simply the one sentence holding that the "evidence of Sass' prior offenses [prior DUIs] and the gravity of his convicted offenses [DUI resulting in a death and injury] constitute some evidence to support the Board's decision." <u>Id</u>., 461 F.3d 1123; the dissent disagreed, and found AEDPA unreasonableness. The Ninth Circuit was reviewing a third denial of suitability. If jurists of the Ninth Circuit cannot agree whether the circumstances of the crime can constitute some evidence given three hearings, how will the BPH or the undersigned know when to stop using the circumstances of a crime as the reason to deny parole eligibility. What will be the analytical watershed point of departure from routinely upholding the BPH assessment of the circumstances of the crime, and more importantly, why? Will the fourth hearing be sufficient, or should it be the seventh? Will the analysis simply hinge on the non-analytical fact that Sass will have passed his minimum terms of years under his sentence? Would a later BPH finding of egregiousness be AEDPA unreasonable simply because Sass just passed his minimum term as opposed to just before the expiration of his minimum term? None of these questions have been answered.

In <u>Irons</u>, after five parole suitability hearings, the Ninth Circuit determined that the second degree murder of a perceived thieving drug dealer by a wildly shooting, and then stabbing, angry "victim" of the deceased was comparatively more egregious than the murder in <u>Sass</u>. Perhaps so; perhaps other jurists would locate this line in another position because of the societal impact that drunk drivers impose in this country. Both positions have their points. But

one can validly question whether the ultimate goal of every parole eligibility hearing, determining *future* safety of the community, can forever be based on personal judgments on the comparative seriousness of crimes committed decades ago.

Nevertheless, taking an implied cue from <u>Irons</u> that the minimum term might serve as an analytical change point, the undersigned finds that prior to that time, absent extraordinary circumstances, the BPH determination on factors relating to the circumstances of the crime are essentially unreviewable, i.e., the determination constitutes "some evidence" sufficient to deny parole eligibility (suitability).

This case cannot be decided on the above finding because petitioner's 16 year incarceration at the time of the 2006 suitability hearing has exceeded his minimum term of 15 years. As stated above, petitioner's 2006 suitability hearing was his fourth subsequent suitability hearing.

Nearly the same day as <u>Irons</u> was decided, the Ninth Circuit reversed a grant of parole eligibility in <u>Kunkler v. Muntz</u>, 2007 WL 683970 (9th Cir. 2007).[3] The facts of the second degree murder were not set forth in the opinion, but the fact of Kunkler's 1983 conviction, and the fact that Kunkler had been considered for parole suitability *ten times* were set forth. Kunkler had been imprisoned well beyond any minimum term. On his last two BPT (now BPH) hearings, the commissioners had found Kunkler suitable for parole, but the Governor reversed both decisions in part on his perception of the seriousness of the crime. Indeed, this was *the* ground on which the state courts in unpublished orders had ultimately upheld the Governor's decision. The district court applied the <u>Biggs</u> dictum regarding reliance on unchanging factors. In reversing the district court, the Ninth Circuit, citing <u>Sass</u>, viewed the <u>Biggs</u> dictum as merely advice to the *next BPH panel* that it might wish to depart from its continued reliance on a non-

---

[3] Unpublished Ninth Circuit decisions may be cited commencing with decisions issued in 2007. Ninth Circuit Rule 36-3. Although still not precedential in the binding sense, the unpublished decisions do have a certain amount of persuasive value, and indicate how Ninth Circuit judges apply binding precedent.

changing factor.  Kunkler at *2 ("'it is not [this court's] function to speculate about how future parole hearings could proceed.'").  Evidently, no matter how many times the BPH and/or the Governor utter an undoubtedly correct conclusion that a murder is serious, or a motive trivial, or that the victim suffered, these unchanging factors will always constitute "some evidence" in federal habeas corpus review.

In petitioner's case before this court, the BPH relied on the circumstances of the offense to find petitioner unsuitable.  Although the BPH did not use the specific language, it is clear that they found the offense to have been carried out in a manner that demonstrated an exceptionally callous disregard for human suffering and involved a trivial motive.  Cal. Code Regs. tit. 15, §§ 2402(c)(1)(D) and (E) (factors tending to show unsuitability for release on parole); see Answer, Exhibit B, pp. 75-76) (BPH discussing decision finding petitioner unsuitable).  Nevertheless, in light of the above authority, the undersigned cannot find at this time that the state courts in this case were AEDPA unreasonable by failing to reject the unchanging circumstances conclusion of the BPH.  Thus, as a matter of law, some evidence existed to satisfy the standards of the parole suitability liberty interest.

Because circumstances of the crime alone can constitute some evidence, there is no point in discussing the other factors of parole suitability, and whether some evidence existed for the conclusions reached in the other factors by the BPH.[4]  However, this court observes that in finding petitioner unsuitable, the only post-conviction factors relied on by the panel were two recent counseling chronos and petitioner's "uptight" demeanor at the suitability hearing.  Answer, Exhibit B, p. 78-79. One chrono was for using a self-adhesive label. Id., p. 37. The other chrono was for getting off his bunk when he was not supposed to. Id., pp. 34-37.  The

---

[4] Rosenkrantz also required that the then BPT also make an individualized consideration of the other factors regarding parole suitability.  Of course, the Commissioners always make such a determination as the Commissioners know that they must.  Whether these determinations are supported by some evidence is another matter, but as long as the consideration is made, the circumstances of the crime are sufficient to deny suitability.

circumstances that led to this chrono were not serious.  Id.

Neither these chronos nor petitioner's demeanor, especially in contrast with his positive incarceration record discussed at the hearing, support a finding of unsuitability.  In finding petitioner unsuitable, the BPH paid scant attention to any rehabilitation factors.  However, based on the recent case law set forth above, this court must find that the decision finding petitioner unsuitable based on the pre-commitment factors was supported by some evidence.

After independently reviewing the record, the court finds that the state court decisions finding sufficient evidence to support the 2006 BPH decision finding petitioner unsuitable were not based on an unreasonable application of clearly established Supreme Court authority.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 10/30/07

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

rider.157